UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHELAN ADVISORY CAPITAL MARKETS, LLC and WHELAN ADVISORY, LLC, <br><br> Petitioners, <br><br> v. <br><br> HOMESOURCE OPERATIONS, LLC, <br><br> Respondent. | 24 Civ. 207 (DEH) <br><br> **OPINION AND ORDER** |

DALE E. HO, United States District Judge:

On January 10, 2024, Petitioner Whelan Advisory Capital Markets, LLC and Whelan Advisory, LLC (collectively, "Whelan") filed a Petition and Motion to Confirm Arbitration Award, along with supporting materials. *See* ECF Nos. 1, 6. On February 20, 2024, Respondent HomeSource Operations, LLC ("HomeSource") filed a Cross Motion to Vacate the Arbitration Award. ECF No. 15. For the reasons set forth below, Petitioner's motion is **GRANTED**, Respondent's motion is **DENIED**, and the Arbitration Award is **CONFIRMED**.

## BACKGROUND

### I.   The Parties

Whelan Advisory Capital Markets, LLC, and Whelan Advisory, LLC, were established by Margaret Whelan ("Ms. Whelan"). Pet'r's Opp'n Br. 7, ECF No. 18.[1] Ms. Whelan has more than 25 years of experience on Wall Street, with knowledge in the homebuilding, building materials, and construction markets. *Id.* In 2014, she established Whelan Advisory, LLC, to offer a tailored, transparent approach to investment banking for homebuilders, construction companies, and building products companies. *Id.* In January 2021, Ms. Whelan established

---

[1] All page numbers are in reference to ECF, and not internal, page numbers.

Whelan Advisory Capital Markets, LLC, which in August 2021 became registered as a broker-dealer firm with the Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory Authority ("FINRA") member firm. *Id.*

HomeSource was founded in 2019 by Randy Hagedorn, Adam Levinson, and Rich Scola to invest in and manage single-family rental ("SFR") properties. *Id.* at 7-8.

## II.     The Advisory Agreement Between Whelan and HomeSource

In or around the spring of 2021, Randy Hagedorn contacted Ms. Whelan to ask for her help raising additional capital, leading to their negotiation and execution of the Advisory Agreement at issue in the Arbitration. Pet'r's Opp'n Br. 8. On July 2, 2021, HomeSource entered into the Advisory Agreement with Whelan. *See* Mot. to Confirm Arbitration Award Ex. A ("Advisory Agreement"), ECF No. 6-1.[2]

The Advisory Agreement provides that HomeSource will pay Whelan a "Success Fee . . . upon the closing of a Transaction . . . directly out of the proceeds of the Transaction (or, if agreed to by [Whelan], [HomeSource] shall cause [Whelan] to be paid by *any affiliate of* [HomeSource] *that may be a party to the Transaction*)." *Id*. § 3b (emphasis added). In addition, the Advisory Agreement provides that there will be a Success Fee if HomeSource "enter[s] into *any transactions* . . . with *any person* that [Whelan] *introduces or refers* to [HomeSource]." *Id*. § 4 (emphases added). The Advisory Agreement states, "[f]or purposes of this Agreement, 'Transaction' shall mean the placement of equity capital with [HomeSource] for the purpose of

---

[2] Hollister Associates, LLC ("Hollister"), was also party to the Advisory Agreement. *See* Advisory Agreement. However, on September 16, 2021, Hollister assigned its rights and obligations to Whelan. S*ee* Mot. To Confirm Arbitration Award, Ex. B ("Assignment Agreement"), ECF No. 6-2; *see also* Pet'r's Opp'n Br. 6 n.3.

participating in [HomeSource's] single family rental investment program." *Id*. § 1.[3] The Success Fee would be, at minimum, $1 million or "three percent (3.0%) of the amount of capital that is invested, contributed, committed[,] or otherwise made available to [HomeSource], whether in the form of equity or equity-linked securities (including convertible equity) (the 'Committed Capital')." *Id*. § 3b. This Success Fee survives the termination of the agreement for 24 months. *Id*. § 4.

The Advisory Agreement states that, in the event of a disagreement, "the dispute(s) shall [] be settled by arbitration in New York and under New York law in accordance with the Code of Arbitration procedure of FINRA." *Id.* § 12.

### III.    Transaction in Dispute

In October and November 2021, Whelan began acting on the Advisory Agreement by "contact[ing] a few potential investors, including NexPoint, to invest equity capital with HomeSource and enable it to develop and grow its own SFR portfolio." Levinson Decl. ¶ 9, ECF No. 17.

On December 4, 2021, in a Letter of Intent ("LOI") emailed from NexPoint to HomeSource and Whelan, NexPoint submitted a proposal "to form a new [real estate investment trust ("REIT")] and provide future debt and equity growth capital to implement [HomeSource's] SFR acquisition strategy." Levinson Decl. Ex. 1 ("REIT LOI") 2, ECF No. 17-1.

In the REIT LOI, NexPoint explains how it formed a similar REIT for another company known as VineBrook Homes Trust, Inc. ("VineBrook Homes"). *Id*. NexPoint purchased a portfolio owned by VineBrook Homes and created a VineBrook REIT. *Id*. VineBrook Homes would remain an independently owned company; maintain property management contracts for

---

[3] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

the portfolio; and earn property management, acquisition, and construction management fees, until Vinebrook Homes "is internalized into VineBrook REIT." *Id*. As of December 4, 2021, NexPoint had "raised over $700 million of equity capital and over $1 billion of debt capital for [VineBrook Homes]." *Id*. NexPoint also notes that VineBrook Homes "owned 5.6% of VineBrook REIT." *Id*. NexPoint concludes that, "The structure used for the VineBrook transaction is the same as the one NexPoint is proposing in this LOI." *Id*. at 3.

> The REIT LOI provides for the Success Fee payment to Whelan:
>
> The REIT and [HomeSource] are responsible for payment of [a Success Fee] to Whelan equal to 3% of the equity contributed to the REIT or [operating partnership ("OP")] [] if definitive documents are executed by [HomeSource] and the REIT. The [Success] Fee will be paid at the time the equity is contributed to the REIT or OP. The first $3 million of the fee earned is payable by the REIT, with the balance of the [Success] Fee to be split equally between the REIT and [HomeSource] (50/50). In no case will the [Success] Fee be less than $3 million."

*Id*. at 7.

Approximately one month later, "[b]etween January 1, 2022 and June 3, 2022, in anticipation of the Formation [of the REIT], affiliates of [NexPoint], loaned an affiliate of [HomeSource] an aggregate of $181.6 million, as evidenced by a series of promissory notes . . . to acquire [1,232 single-family rental homes] from a number of third-party sellers that met the investment criteria of [HomeSource]." Levinson Decl. Ex. 3 Private Placement Memorandum ("PPM") 13, ECF No. 17-3. "On February 1, 2022, the Operating Partnership loaned [HomeSource] $4.8 million, as evidenced by the [promissory notes], to purchase the 70% of [HomeSource] not previously owned by [Randy Hagedorn, Adam Levinson, and Rich Scola]." *Id*. at 63. "As consideration for [these promissory notes], the [NexPoint] Operating Partnership received a 9.99% non-voting ownership stake in [HomeSource]." *Id*.

Approximately six months later, on June 6, 2022, HomeSource confirmed with Whelan that a contract between NexPoint and HomeSource had been signed but was "being held by

4

[their] lawyers in escrow." Rasey Decl. Ex. H-2.D ("Email Correspondences") 13, ECF No. 19-8. Accordingly, Whelan sent an invoice to HomeSource and NexPoint shortly thereafter, in the amount of $13,812,252. *Id*. at 15. Separately, HomeSource and NexPoint privately discussed the invoice. NexPoint stated that they "auto-delete" emails from Whelan, and HomeSource stated that "[a]ll we have to do is refute the invoice amount." *Id*. at 26, 28.

In line with the REIT LOI proposal, NexPoint and HomeSource entered into a management agreement on June 8, 2022, *see* Levinson Decl. Ex. 2 ("Management Agreement"), ECF No. 17-2, followed by a PPM on June 9, 2022, to create a public offering of shares for the REIT, *see generally* PPM. Through the PPM, HomeSource's co-founder Randy Hagedorn was named Director of the REIT and appointed to the Investment Committee. *Id.* at 90. HomeSource's co-founders Randy Hagedorn, Adam Levinson, and Rich Scola each invested in the Operating Partnership. *Id.* at 64.

> The PPM also discusses Whelan's Success Fee:
>
> [HomeSource] used a broker to find additional capital which led to the introduction to NexPoint. The broker, Whelan Advisory LLC and its affiliates ("Whelan"), *are owed a fee under the terms of the agreement executed between [HomeSource] and Whelan on July 2, 2021* (the "Letter Agreement"). Under the terms of an amendment to the Letter Agreement (the "Amended Letter Agreement"), if the Amended Letter Agreement is executed, a success fee ("Success Fee") is owed to Whelan by the Manager equal to 3.0% of equity capital contributed to the Company or Operating Partnership by NexPoint or its affiliates up to a maximum $450 million of contributed equity. The Success Fee is due and payable upon contribution of the equity capital to the Company or Operating Partnership. Pursuant to the Side Letter, if the Amended Letter Agreement is executed, the Operating Partnership has agreed to pay the first $3 million of the Success Fee owed (i.e. on $100 million of equity capital contributed) and then to pay 50% of the Success Fee thereafter with the Manager paying the other 50% of the Success Fee owed. As of June 8, 2022, the Operating Partnership owes the Manager $3.25 million for payment of the Success Fee. Also pursuant to the terms of the Side Letter, to the extent the Initial Portfolio is sold to the Operating Partnership, 100% of any net proceeds due to the Manager from the sale must be invested in OP Units priced at the then-current NAV [net asset value].

*Id*. at 95-96 (emphasis added).

However, no payment was made to Whelan. *See* Mot. to Confirm Arbitration Award Ex. G ("Arbitration Award") 7, ECF No. 6-7; *see also* Pet. ¶ 1, ECF No. 1. On November 11, 2022, after arbitration proceedings had commenced, a supplement to the PPM noted:

> [I]n connection with the Formation [of the REIT], [HomeSource] entered into an agreement with broker dealer [Whelan] and the amount due by [HomeSource] to Whelan is in dispute. A lengthy dispute with Whelan or determination in favor of Whelan could require [HomeSource] to pay substantial costs or damages, be time-consuming and distract [HomeSource] from operating our business or impose other unfavorable terms or consequences on [HomeSource] and [the REIT].

Levinson Decl. Ex. 4 ("Supplemental PPM") 7, ECF No. 17-4.

### IV. Arbitration

On October 9, 2022, Whelan commenced arbitration via FINRA Dispute Resolution Services against HomeSource and NexPoint. Arbitration Award 2-4. NexPoint did not voluntarily submit to arbitration and is not a member of FINRA, and therefore no judgement was made against NexPoint. *Id.* at 4. On or around February 10, 2023, a panel of three arbitrators was appointed in accordance with FINRA's Code of Arbitration Procedure, comprising of Robert Neal Hunter, Jr., David F. Simon, and John Gorman (the "Arbitration Panel"). Arbitration Award 10; *see generally* Mot. to Confirm Arbitration Award Ex. E ("Panel Notice Letter"), ECF No. 6-5. The Arbitration Panel held evidentiary hearings in New York on November 1, 2, and 3, 2023. Arbitration Award 5.

On November 30, 2023, the Arbitration Panel awarded Whelan a total of $15,980,043.31 for damages, prejudgment interest, and attorneys' fees and costs (collectively, the "Award"). *Id.* at 4, 8. In its findings, the Arbitration Panel noted that "the evidence showed Respondent HomeSource express[ed] satisfaction with [Whelan's] services. The services resulted in a Transaction between [HomeSource] and [NexPoint] in which capital in the form of equity-based securities was invested with the Company's single family rental investment program." *Id.* at 6.

In making its decision, the Arbitration Panel referred to the "plain language" of the Advisory Agreement and found that "HomeSource has breached its contract with [Whelan] and [Whelan is] entitled to monetary damages and plus prejudgment interest as computed under New York state law. Also, [Whelan is] entitled to specific performance of its contract in the future . . . and [is] entitled to attorneys' fees and costs in connection with this arbitration." *Id.* at 6-7.

HomeSource was ordered to pay the Award within 30 days of receipt. *Id.* at 11. To date, no payment has been made. Pet. ¶ 1.

### V.     Procedural History

On January 10, 2024, Whelan submitted a Petition to Confirm Arbitration and a Motion to Confirm Arbitration Award. *See* ECF Nos. 1, 6. On February 20, 2024, HomeSource filed a Cross Motion to Vacate Arbitration Award. *See* ECF No. 15. The motions are fully briefed.

## LEGAL STANDARDS

Confirmation of an arbitration proceeding is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Beijing Shougang Mining Inv. Co., Ltd. v. Mong.*, 11 F.4th 144, 160 (2d Cir. 2021); *see also Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 809 (2d Cir. 2022). "The review of arbitration awards is very limited in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Beijing Shougang Mining Inv. Co.*, 11 F.4th at 160. "Arbitration panel determinations are generally accorded great deference under the Federal Arbitration Act ['FAA']." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 103 (2d Cir. 2013) (describing a district court's role as "narrowly limited").

"Because the FAA establishes a strong presumption in favor of enforcing an arbitration award, . . . an award is presumed valid unless proved otherwise." *Smarter Tools Inc. v.*

7

*Chongqing Senci Imp. & Exp. Trade Co., Ltd.*, 57 F.4th 372, 389 (2d Cir. 2023). Even if the Court disagrees with the arbitrator's findings on the merits, it should confirm the arbitration award so long as there is a "barely colorable justification for the outcome reached." *Id.* at 383; *see also id.* at 378-79 (stating that "an extremely deferential standard of review" is appropriate "to encourage and support the use of arbitration by consenting parties"). Conversely, an unopposed petition to confirm an arbitration award must fail "where the undisputed facts fail to show that a movant is entitled to judgment as a matter of law." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).

"The [FAA] provides a streamlined process for a party seeking a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Seneca Nation of Indians v. N.Y.*, 988 F.3d 618, 625 (2d Cir. 2021). Under this process, the Court must confirm an arbitration award "unless the award is vacated, modified, or corrected as prescribed in §§ 10 and 11." 9 U.S.C. § 9. Section 10(a) of the FAA sets forth the narrow grounds for vacating an arbitration award. *See id.* § 10(a)(1)-(4).

## DISCUSSION

Respondents argue that the Arbitration Panel acted in "manifest disregard of the law" in two respects: (1) by failing to interpret the term "Transaction" as clearly and unambiguously defined in the Engagement Letter between HomeSource and Whelan; and (2) by disregarding the corporate form by imputing investment into separate and distinct entities onto HomeSource, despite the fact that Whelan did not show the requisite elements to properly pierce the corporate veil. Resp't Mem. 5, ECF No. 16.

Because Respondents have not met their burden of establishing that the arbitration award lacks a "barely colorable justification," their motion for vacatur is **DENIED**, and Petitioners' motion to confirm arbitration is **GRANTED**.

### I.    Meaning of 'Transaction' Per the Advisory Agreement

There is "an extremely deferential standard of review . . . in the context of arbitral awards." *Smarter Tools*, 57 F.4th at 378. "The award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *Id.* at 379. "[HomeSource] bears the heavy burden of showing that (1) 'the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators,' (2) 'the law was in fact improperly applied, leading to an erroneous outcome,' and (3) 'the arbitrator . . . kn[ew] of its existence, and its applicability to the problem before him.'" *Wells Fargo Advisors LLC v. Tucker*, 373 F. Supp. 3d 418, 424 (S.D.N.Y. 2019) (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003). It is a "severely limited doctrine" applicable "only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004).

Here, relying on §§ 1 and 3 of the Advisor Agreement, the Arbitration Panel concluded, "NexPoint and Respondent HomeSource finalized their arrangement entering into a 'Closing' comprised of [a] series of transactions in which equity and equity-based securities were placed with the Respondent HomeSource's single family resident program." Arbitration Award 7.

HomeSource, however, contends the equity investment in the NexPoint REIT and Operating Partnership did *not* constitute a transaction as defined by the Advisory Agreement. *Id.* at 22. According to Homesource, the Advisory Agreement between the parties provides that equity capital must be placed *directly* with HomeSource in order for there to be a "Transaction"—and that without such a direct transaction there no Success Fee is owed to Whelan. Resp't Mem. 20-22. HomeSource argues, therefore,

9

But there is more than a "barely colorable justification" for the Arbitration Panel's conclusion that there was a "Transaction" per the plain language of the Advisory Agreement as a whole. There appears to be no dispute that Whelan brokered an agreement between HomeSource and NexPoint that resulted in $422,097,803.04 of capital contributions to the REIT and Operating Partnership. Pet'r's Opp'n Br. 11; Resp't Mem. 16-17. And the continued notation of the Success Fee in both the REIT LOI and PPM demonstrates that HomeSource understood that there would be a Success Fee owed to Whelan. REIT LOI 7; PPM 95-96. Furthermore, the REIT LOI states that, notwithstanding the precise form of its investment (i.e., via the REIT), NexPoint would be raising equity capital for HomeSource in the same manner that it did previously for its previous partner, VineBrook Homes. REIT LOI 2-3. Given the plain language of the Advisory Agreement, the Arbitration Panel was justified in concluding that there was a "Transaction" between NexPoint and HomeSource, as that term is defined in the Agreement; that the Transaction occurred as a result of Whelan's introduction of the entities; and that Whelan was therefore entitled to a Success Fee.[4]

Finally, even if HomeSource had the better interpretation of "Transaction" under the Advisory Agreement, that would not be a ground for vacatur, as vacatur of the Arbitration Award requires "more than a simple error in law or a failure by the arbitrators to understand or apply it; and it is more than an erroneous interpretation of the law." *Duferco Int'l Steel Trading*, 333 F.3d at 389. "In all events, the Arbitrator's determination of the scope of the '[Transaction]' involves, at most, an interpretation of the term '[Transaction]' and the application of that term to

---

[4] The parties' behavior confirms that understanding: the REIT LOI—which included references to the Success Fee—was sent directly to Whelan, indicating that the parties understood that the transaction was a result of the introduction between NexPoint and HomeSource by Whelan, and that it would result in a Success Fee as defined by the original Advisory Agreement. *See* REIT LOI 6.

facts—an error as to which does not provide a basis for vacating an arbitral award for manifest disregard." *Cognac Ferrand S.A.S. v. Mystique Brands LLC*, 2021 WL 119572, at *9 (S.D.N.Y. Jan. 13, 2021).

Because there is more than a "barely colorful justification" for the Arbitration Panel's determination that there was a "Transaction" as defined by the terms of the Advisory Agreement, its decision is confirmed.

## II.      "Piercing the Corporate Veil" Argument

HomeSource next argues that the REIT and Operating Partnership are "completely separate companies [from HomeSource]" and therefore the Arbitration Panel "imput[ed] equity capital placed with NexPoint [Operating Partnership] and NexPoint REIT onto HomeSource" as they are distinct entities, without piercing the corporate veil. Resp't Mem. 22, 24. Its argument is unavailing.

Again, there is more than a "barely colorable justification" for the Arbitration Panel's contrary determination. As much of the discussion above indicates, there is adequate support for the determination that, under the Advisory Agreement, NexPoint was in fact investing in HomeSource. For example, in the initial LOI with NexPoint, NexPoint specifically noted that it had raised equity capital for its previous partner, VineBrook Homes, in a similar manner. REIT LOI 2-3. It states that the "structure used for the VineBrook [Homes] transaction *is the same* as the one NexPoint [proposed in the PPM]." REIT LOI 3 (emphasis added). Looking at the subsequent PPM, this appears largely to be true. *See generally* PPM. The PPM also states that the NexPoint Operating Partnership received a 9.99% non-voting ownership stake in HomeSource, HomeSource's co-founder Randy Hagedorn was named Director of the REIT, and all of HomeSource's co-founders directly invested in the NexPoint Operating Partnership. *Id.* at 11, 64, 90.

Even if the creation of the REIT and Operating Partnership was done in such a way to avoid resulting investment directly in HomeSource, it is clear from the above facts that the Operating Partnership and REIT are, at minimum, affiliates of HomeSource and that the Transaction came about because of Whelan's introduction between NexPoint and HomeSource. As a result, the Operating Partnership and REIT clearly fall within the scope of § 3b of the Advisory Agreement ("any affiliate of [HomeSource] that may be a party to the Transaction") and § 4 ("any person that the Advisor introduces or refers [HomeSource to]"), and therefore there is no need for "corporate veil piercing." Advisory Agreement §§ 3b, 4. Although the Arbitration Panel did not adopt this argument explicitly, the Arbitration Panel's "rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *Bogar v. Ameriprise Fin. Servs.*, No. 16 Civ. 7199, 2017 WL 1745566, at *9 (S.D.N.Y. May 4, 2017).

At any rate, "[i]nterpretation of these contract terms is within the province of the arbitrator and will not be overruled simply because [this Court] disagree[s] with that interpretation." *Cognac Ferrand S.A.S.*, 2021 WL 119572, at *24 (quoting *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997)). Here, the Arbitration Panel was justified in finding that there was a closing "compris[ing] of [a] series of transactions in which equity and equity-based securities were placed with the Respondent HomeSource's single family resident program." Arbitration Award 7.

## CONCLUSION

For the reasons given above, the cross-motion to vacate the Final Award is **DENIED**. Because the FAA requires that an arbitral award be confirmed unless it is vacated, *see* 9 U.S.C. § 9, Whelan's petition to confirm is **GRANTED** and the Final Award is **CONFIRMED.**

The Clerk of Court is directed to terminate ECF Nos. 6 and 15, and to close the case.

SO ORDERED.

Dated: September 10, 2024
New York, New York

DALE E. HO
United States District Judge